# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDNA JOPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-074-SLR |
| | ) |
| MICHAEL J. ASTRUE,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Gary C. Linarducci, Esquire, and Steven Lloyd Butler, Esquire, of Linarducci and Butler, Wilmington, Delaware. Counsel for Plaintiff.

David F. Chermol, Esquire, and Joyce M.J. Gordon, Esquire, of the Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: September 24, 2007
Wilmington, Delaware

[1]On February 12, 2007, Michael J. Astrue replaced Jo Anne B. Barnhart as Commissioner of Social Security.

ROBINSON, District Judge

## I. INTRODUCTION

Before the court is an appeal filed by Edna Jopson ("plaintiff"), seeking review of

the final decision of defendant, Michael J. Astrue, Commissioner of the Social Security

Administration (the "Commissioner"), denying plaintiff's application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-

433. Plaintiff has filed a motion for summary judgment asking the court to reverse

defendant's decision and award her benefits. (D.I. 11) Defendant has filed a cross-

motion for summary judgment, requesting the court to affirm his decision. (D.I. 14) The

court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g).[2]

## II. BACKGROUND

### A. Procedural History

On October 24, 2001, plaintiff filed an application with the Social Security

Administration ("SSA") for DIB because of her fibromyalgia and depression. (Id. at 76-

78) On March 11, 2002, the SSA issued a "Notice of Disapproved Claims," denying

plaintiff's application for DIB after finding that she was not disabled. (Id. at 47-50) On

May 9, 2002, plaintiff requested that the SSA reconsider its decision to deny DIB to her.

(Id. at 51-52) On June 21, 2002, the SSA decided that, after reconsideration, the

decision had been proper and plaintiff was not eligible for DIB. (Id. at 53-56)

_____

[2] Under § 405(g),

> [any] individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party . . . may obtain a review of such
> decision by a civil action commenced within sixty days after the mailing to him of
> notice of such decision . . . . Such action may be brought in the district court of
> the United States for the judicial district in which the plaintiff resides . . . .

After having unsuccessfully appealed the SSA's first decision, plaintiff filed another application for DIB on February 11, 2004. (Id. at 438) Plaintiff justified the new application on the continuation of fibromyalgia and depression, as well as a herniated disc, severe fatigue, and frequent migraine headaches. (Id. at 136-43) On April 29, 2004, the SSA denied the new application for DIB. (Id. at 59-63) Plaintiff requested reconsideration of this finding, which request was denied. (Id. at 65-69)

After the SSA denied plaintiff's request for reconsideration on July 4, 2004, plaintiff submitted a request for an appeal before an Administrative Law Judge ("ALJ"). (Id. at 7) The appeals hearing was held before ALJ Judith Showalter on April 12, 2005; ALJ Showalter wrote an opinion on April 27, 2005, confirming the denial of DIB to plaintiff. (Id. at 19-21) Plaintiff's request that the SSA Office of Appeals and Hearings reconsider ALJ Showalter's decision was denied on December 7, 2005. (Id. at 7-10, 17)

## B. Medical History

Plaintiff, born on July 26, 1953, is currently unemployed, but has previous work experience as a school bus driver and a waitress. (D.I. 7 at 137, 221) In April 1996, she was injured when her bus was forced off the road on the way to school. (Id. at 163) As a result of the accident, she suffered injuries to her wrist and her cervical spine. (Id. at 163) An electro-diagnostic study, conducted on June 10, 1996, revealed mild right C-5 radiculopathy[3] and mild right carpal tunnel syndrome. (Id.) Plaintiff continued to experience right hand soreness with a periodic tingling sensation. (Id. at 171) On

---

[3]Radiculopathy is characterized by pain radiating from the spine and extending outward, causing symptoms away from the source of the spinal nerve root irritation.

February 23, 1999, Andrew Gelman, D.O., plaintiff's orthopedic surgeon, recommended surgical decompression to help alleviate the soreness.[4]  (Id.)

In early 2000, plaintiff began to report improvement in her daily pain and soreness; however, on July 22, 2000, she aggravated her spinal injury when she fell on her back "while walking downhill on wet grass." (Id. at 174)  Plaintiff experienced increased pain after her fall and had x-rays of her cervical spine and lumbar spine taken on July 28, 2000. (Id. at 388-389)  The x-rays revealed that plaintiff's cervical spine appeared within normal limits, but her lumbar spine had "minimal degenerative lipping" in the "lower dorsal and upper lumbar spine" and "nonspecific interspace narrowing without associated degenerative change." (Id. at 388)  In August 2000, plaintiff left her bus driving job to become a waitress, despite complaints of severe pain in her wrists and cervical spine. (Id. at 137)

On August 14, 2000, Patrick Williams, M.P.T. ("Williams"), performed a physical examination on plaintiff, who began complaining of severe headaches along with the recurring pain in her wrists and cervical spine. (Id. at 174-75)  Williams' physical examination revealed significant muscle tenderness, notable muscle tightness, and significant restriction in her cervical range of motion. (Id.)  For treatment, Williams recommended modalities for symptom management, soft tissue techniques, passive stretching, and an eventual cervical stabilization program. (Id.)

On February 9. 2001, plaintiff was referred to Russell J. Labowitz, a board-certified rheumatologist. (Id. at 190-91)  After Dr. Labowitz's initial physical

---

[4]There are no records before the court which indicate that plaintiff ever received the surgical decompression recommended by Dr. Gelman.

3

examination, he wrote that he was not sure of the etiology for plaintiff's musculoskeletal complaints. (Id.) Dr. Labowitz noted that: the peripheral joints of plaintiff's upper and lower extremities were normal; plaintiff had a full range of motion in all joints tested; examination of plaintiff's cervical spine revealed a normal range of motion without spasm or tenderness; although there was a tender point along the left parascapular area, examinations of the dorsal spine and lumbar spine were normal; the general systemic examination revealed no adenopathy (enlargement involving glandular tissue, especially the lymph nodes); examination of the heart and lungs was normal; and examination of the abdomen revealed a questionably enlarged spleen. (Id.) Despite being unable to determine the source of plaintiff's muscle pain, Dr. Labowitz wrote that plaintiff "deserved a rheumatic workup." (Id.)

During plaintiff's short-lived employment as a waitress, she continued to complain of pain and received conservative treatment and a variety of medications[5] from George Namey, D.O., her primary care physician. (Id. at 365-81) Plaintiff also received treatment and medication[6] for depression from board-certified psychiatrist Oscar Galvis, M.D. (Id. at 320-30) Plaintiff began reducing her waitressing schedule to

---

[5]The medications which Dr. Namey prescribed included 240mg of Covera-HS®, 240mg of Verapamil®, 160mg of Diovan®, 20mg of Prilosec®,12.5mg of hydrochlorot, 20mg of oxycontin, 5-325mg of Endocet®, 350 mg of carisoprodol, 7.5-325mg of Percocet®, 0.5mg of lorazepam, 4mg of methylpred, and 20mg of omeprazole. (D.I. 7 at 396-425)

[6] The medications which Dr. Galvis prescribed include 0.5mg of Alprazolam, 2mg of clonazepam, 10mg of Ambien®, 150 mg of Effexor XR®, 10mg of Lexapro®, 25mg of amitriptylin, 20mg of Prozac®, 0.25mg of Xanax®, 200mg of wellbutrin, 100mg of Zoloft®, 30mg of phentermine, 25 mg of Topamax®, 25 mg of Imitrex®, 40mg of fluoxetine, and an undetermined amount of Ritalin®. (D.I. 7 at 396-425)

accommodate her medical conditions. (Id. at 137) As the pain and muscle soreness worsened, plaintiff began leaving prior to the completion of her scheduled shifts, reducing the number of tables she served, and taking additional unscheduled breaks. (Id.) On April 25, 2001, plaintiff stopped working as a waitress because she felt she could no longer meet the physical demands of the job. (Id. at 89)

Plaintiff continued to see Dr. Labowitz, who reported possible fibromyalgia[7] on May 9, 2001. (Id. at 188) Plaintiff continued to report regular headaches along with painful muscle soreness and joint swelling. (Id.) Dr. Labowitz originally prescribed Tylenol No. 3®, and eventually felt it necessary to prescribe Percocet®. (Id.) Dr. Namey, plaintiff's primary care physician, was also attempting to treat plaintiff's pain with oxycontin. (Id. at 406)

On February 12, 2002, plaintiff was required by Disability Determination Services ("DDS") to undergo a medical evaluation with Yong K. Kim, M.D. (Id. at 206-12) In his written evaluation, Dr. Kim wrote that plaintiff's chief complaints were of pain in her neck, interscapular area, arms and legs as well as constant tiredness. (Id. at 206) With regard to plaintiff's extremities, Dr. Kim wrote that her range of motion was within normal limits except for the abduction of her shoulders. (Id. at 207) No joint swelling or edema in the hands or feet were noted. (Id.) Tenderness existed around plaintiff's elbows, knees, and ischeal tuberosity (hamstring) area. (Id.) With respect to plaintiff's

---

[7]The term "myalgia" refers to muscle pain. Fibromyalgia indicates pain in fibrous tissues, muscles, tendons, ligaments, and other areas. This diagnosis is made on the basis of an individual's subjective symptoms after testing has excluded underlying systemic or autoimmune disorders. Fibromyalgia may disappear spontaneously but can become recurrent or chronic. The Merck Manual, 481-82 (17th ed. 1999).

spine, Dr. Kim wrote that the range of motion of plaintiff's cervical spine was limited and that she had moderate tenderness and muscle tightness in the upper trapezii, levator scapulae, suboccipital area, and interscapular area.[8] (Id.) Dr. Kim also noted that plaintiff appeared to be depressed, with significant decreased facial expression. (Id.) Upon examination, plaintiff had no muscle atrophy; she could stand and walk on both her toes and heels;[9] her straight leg-raising test was negative;[10] her gait was within normal limits; her fine finger movement was within normal limits on both sides; and her grip strength was normal on both sides. (Id.) Dr. Kim's diagnostic impression was that plaintiff suffered from fibromyalgia and depression. (Id.)

On February 21, 2002, a non-examining state agency medical consultant ("state consultant") filled out a physical residual functional capacity assessment ("PRFCA") based upon an examination of plaintiff's file. (Id. at 213-20) The state consultant indicated that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (Id. at 214) The state consultant also indicated that plaintiff could "occasionally" climb, balance, stoop, kneel, crouch, or crawl. (Id. at 215) No manipulative, visual, or communicative

---

[8]Generally speaking, this means the neck area.

[9]Physicians check heel and toe walking because difficulty with heel walking is a sign of L5 nerve root compromise, while difficulty with toe walking is a sign of S1 nerve root compromise. Gunnar Andersson, M.D., and Thomas McNeill, M.D., Lumbar Spine Syndromes: Evaluation and Treatment, 78 (1989).

[10]A straight leg-raising test is used to evaluate possible nerve root pressure, tension, or irritation of the sciatic nerve. Andersson and McNeill, Lumbar Spine Syndromes: Evaluation and Treatment at 78.

6

limitations were indicated. (Id. at 216-17) The only environmental limitation that the state consultant indicated was that plaintiff should avoid concentrated exposure to hazards such as machinery or heights. (Id.) While the state consultant noted that plaintiff's symptoms were attributable to a medically determinable impairment, he or she did not agree that the severity of plaintiff's symptoms or the alleged effect on plaintiff's functioning was consistent with the total medical and non-medical evidence, including statements by the plaintiff and others, observations regarding activities of daily living, and alterations of usual behavior or habits. (Id. at 218) The state consultant had no statements from plaintiff's treating physicians within the file. (Id. at 219)

On February 27, 2002, Marcia Speller, M.D., conducted a psychiatric evaluation of plaintiff. (Id. at 221-28) Dr. Speller agreed with prior diagnoses of fibromyalgia and major depression recurrent. (Id. at 223) Dr. Speller indicated that plaintiff had moderate difficulty relating to other people, moderate to moderately-severe difficulty performing her daily activities and complex tasks. Dr. Speller noted no deterioration in plaintiff's personal habits, but noted moderate decrease in her interests. Dr. Speller observed that plaintiff had moderate limitations comprehending and following instructions, performing work requiring frequent contact with others, performing work with minimal contact with others, performing simple tasks, performing repetitive tasks, and performing varied tasks. (Id. at 225-26) Despite plaintiff's "constricted affect and depressed mood," Dr. Speller considered her thought processes to be intact, as was her orientation to time, place, and people. (Id. at 223) Dr. Speller indicated that plaintiff's impairments could be expected to last for 12 months or longer at a comparable level of severity. (Id.)

7

On March 5, 2002, Janet Brandon, Ph.D., a state consultant, filled out a "Psychiatric Review Technique" form ("PRT") and a mental residual functional capacity assessment ("MRFCA"). (Id. at 229-46) In the PRT, Dr. Brandon wrote that plaintiff suffered from mild depression. (Id. at 232) Dr. Brandon further indicated that plaintiff had mild restriction of the activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining "concentration, persistence, or pace," and no episodes of decompensation. (Id. at 239) Dr. Brandon wrote that plaintiff's pain "limited her activities and interfered with her feelings, well-being, and endurance." (Id. at 241) However, Dr. Brandon wrote that plaintiff's "mental ability to know what her requirements are is intact." (Id.)

In the MRFCA, under "Understanding and Memory," Dr. Brandon indicated that plaintiff was not significantly limited in her ability to remember locations, work-like procedures, or short and simple instructions, but was moderately limited in the ability to understand and remember detailed instructions. (Id. at 243) Under "Sustained Concentration and Persistence," Dr. Brandon indicated that plaintiff was not significantly limited in carrying out short and simple instructions, performing activities with a schedule, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, or making simple work-related decisions. (Id. at 244-45) However, Dr. Brandon indicated that plaintiff was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Id.)

8

Under "Social Interaction," Dr. Brandon indicated that plaintiff was not significantly limited in interacting appropriately with the general public, asking simple questions, requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintaining socially appropriate behavior and adhering to the basic standards of neatness and cleanliness. (Id.) Finally, under "Adaptation," Dr. Brandon indicated that plaintiff's abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or using public transportation, set realistic goals, or make plans independently of others were not significantly limited. (Id.)

Plaintiff continued to report pain and muscle soreness and underwent x-rays of her lumbar spine as well as her sacrum and coccyx on March 12, 2002. (Id. at 385-86) The x-rays revealed degenerative disc narrowing in plaintiff's lumbar spine, but no abnormalities in the sacrum and coccyx. (Id.)

On June 17, 2002, Pedro M. Ferreira, Ph.D., a state consultant, filled out a PRT and a MRFCA. (Id. at 247-64) In the PRT, Dr. Ferreira indicated that plaintiff suffered from moderate depression. (Id. at 250) Dr. Ferreira further indicated that plaintiff had mild restriction of the activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining "concentration, persistence, or pace," and no episodes of decompensation. (Id. at 257) Dr. Ferreira additionally wrote that plaintiff "alleges memory problems but demonstrated an excellent recollection of her [medical history]," and that she should be able to perform unskilled work. (Id. at 263) Dr. Ferreira filled out a MRFCA on June 17, 2002 with identical conclusions to the

9

MRFCA completed by Dr. Brandon on March 5, 2002. (Id. at 255-64)

On June 20, 2002, another state consultant filled out a PRFCA. (Id. at 265-72) The state consultant indicated that plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (Id. at 266) The state consultant also indicated that plaintiff could "occasionally" climb, balance, stoop, kneel, crouch, or crawl. (Id. at 267) No manipulative, visual, or communicative limitations were determined. (Id. at 268-69) The only environmental limitations identified by the state consultant were that plaintiff should avoid concentrated exposure to hazards such as machinery or heights, extreme heat, or vibration. (Id. at 269) There were no statements from plaintiff's treating or examining physicians in the state consultant's file. (Id. at 271)

Plaintiff began treatment with Stephen M. Beneck, M.D. on November 26, 2002, specifically for pain management. (Id. at 311-314) During plaintiff's initial physical evaluation, she complained of pain "everywhere," but especially in her arms and legs. (Id.) Plaintiff also told Dr. Beneck that she continued to suffer severe recurring headaches. (Id.) After the initial evaluation, Dr. Beneck described plaintiff as having "chronic soft tissue pain, as well as chronic numbness and tingling in her lower extremities." (Id.) Dr. Beneck further observed that plaintiff had "significant depression, as well as a non-restorative sleep pattern." (Id.) Dr. Beneck was unclear as to the etiology of plaintiff's painful symptoms. (Id.)

On December 27, 2002, Dr. Beneck conducted an EMG of plaintiff's bilateral lower extremities; the results of this EMG were normal. (Id. at 309-10) A physical

10

examination by Dr. Beneck on this date revealed that plaintiff's cervical range of motion was within functional limits, except for extension. (Id.) Lumbar range of motion was within functional limits, and a neurological evaluation of plaintiff's upper and lower extremities revealed grossly normal and symmetric strength as well as deep tendon reflexes.[11] (Id.)

Plaintiff has continued to see Dr. Beneck for pain management up through the present. On June 6, 2003, Dr. Beneck wrote that plaintiff "continues with chronic pain of undetermined etiology," and that "there is a significant ongoing reactive depression as well." (Id. at 308) On August 19, 2003, after another physical examination, Dr. Beneck again wrote that plaintiff "continues with chronic pain and depression." (Id. at 306) On November 11, 2003, Dr. Beneck again described plaintiff as "continuing with chronic soft tissue pain, headaches and a depression." (Id. at 303) Dr. Beneck continued to increase plaintiff's pain medication, eventually reaching 40mg of oxycontin and 5mg of oxycodone for "breakthrough pain."[12] (Id. at 307, 417) Still experiencing pain, plaintiff again submitted an application to the SSA requesting DIB because of her fibromyalgia, pain, depression, high blood pressure, and herniated disc in her neck. (Id. at 81-84)

On February 18, 2004, Bruce J. Rudin, M.D., gave plaintiff a physical evaluation,

---

[11]Shortly after this December examination, plaintiff's Social Security insurance expired. The relevant time period during which plaintiff seeks to prove disability is, therefore, from her last day of work as a waitress, April 25, 2001, until the date of her insurance's expiration, December 31, 2002.

[12]Dr. Beneck also prescribed plaintiff 2mg of tizanidine, used to treat muscle tightness and spasm, during his course of treatment. (D.I. 7 at 396-425)

11

finding that she walked with a normal gait, had a level pelvis, level shoulders, and normal spinal alignment. (Id. at 331) Dr. Rudin wrote, "[plaintiff] is non tender to palpitation and has no spasm. Reflexes are 2+ and symmetrical. Motor examination is 5/5 and equal, and her sensory examination is intact. She is here today with her MRI which demonstrates moderate cervical spondylosis with neural foraminal narrowing, worse on the right side, with encroachment of the C4, C5 and C6 nerve roots." (Id.) In Dr. Rudin's opinion, plaintiff suffered from multiple issues such as compression, fibromyalgia, and a large need for medication; he did not, however, think plaintiff was a good candidate for surgery and recommended that plaintiff continue with Dr. Beneck's conservative care. (Id.)

On February 27, 2004, Dr. Brandon, a state consultant, again completed a PRT and a MRFCA. (Id. at 337-354) These assessments were based upon a consideration of plaintiff's condition during the relevant time period, April 25, 2001 through December 31, 2002, as well as her current condition. (Id. at 337) Similar to her findings on March 5, 2002, Dr. Brandon indicated that plaintiff suffered from depression. (Id. at 340) Dr. Brandon also confirmed her previous opinion that plaintiff had mild restriction of the activities of daily living, mild difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 347) In the MRFCA, Dr. Brandon again reached the same conclusions as she had on March 5, 2002. (Id. at 351-53) Dr. Brandon noted that plaintiff's "fibromyalgia is distracting and contributes to loss of concentration by painful interference and fatigue." (Id. at 353)

On April 21, 2004, another non-examining state agency medical consultant filled

12

out a PRFCA, considering plaintiff's condition during the relevant time period, April 25, 2001 through December 31, 2002, as well as her current condition. (Id. at 355-62) The state consultant indicated that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (Id. at 356) No postural, manipulative, visual, communicative, or environmental limitations were acknowledged. (Id. at 357-59) The state consultant agreed that plaintiff's symptoms were attributable to a medically determinable impairment; the state consultant felt, however, that plaintiff's alleged symptoms were only partially consistent with the total medical and non-medical evidence, including statements by the plaintiff and others, observations regarding activities of daily living, and alterations of usual behavior or habits. (Id. at 360) There were no statements from plaintiff's treating or examining physicians in the state consultant's file. (Id. at 361)

On March 17, 2005, Dr. Galvis, plaintiff's regular treating psychiatrist, filled out a "Mental Impairment Questionnaire." (Id. at 426-30) Dr. Galvis indicated that plaintiff suffered from fibromyalgia and recurrent major depression. (Id. at 426) Dr. Galvis wrote that, according to his clinical findings based on five years of regular visits with plaintiff, she had a constant depressed mood, a "tearful effect," hopelessness, low energy, trouble with concentration, annedonia, and problems with motivation. (Id.) Dr. Galvis wrote that he expected plaintiff's symptoms and condition to last longer than 12 months, causing her to miss work "about three times each month." (Id. at 427) The "Mental Impairment Questionnaire" listed twenty-nine different "mental abilities" or "aptitudes," such as remembering work-like procedures, understanding and

13

remembering very short and simple instructions, or maintaining attention for two-hour segments. (Id. at 428-29) Dr. Galvis was to choose between "unlimited or very good," "good," "fair," or "poor or none" for each particular mental ability or aptitude. (Id.) Dr. Galvis checked the box indicating "fair" for all twenty-nine questions. (Id.) Dr. Galvis also wrote that plaintiff had marked restrictions with performing the activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of "concentration, persistence, or pace" resulting in failure to complete tasks in a timely manner, and repeated episodes of deterioration of compensation in work or work-like settings, causing her to withdraw from those situations or experience exacerbation of signs and symptoms. (Id.)

On April 12, 2005, Dr. Beneck filled out a "Residual Functional Capacity Evaluation," based on his frequent treatment and examination of plaintiff. (Id. at 432-34) Dr. Beneck wrote that, considering plaintiff's medical history, clinical findings, laboratory findings, diagnoses, and responses to prescribed treatment, she is not capable of performing sedentary work on a regular and continuing basis (i.e., 8 hours a day, 5 days a week). (Id. at 432) Dr. Beneck based plaintiff's inability to perform full-time sedentary work on her "severe chronic pain syndrome and depression." (Id.) In Dr. Beneck's estimation, plaintiff frequently could carry no weight at all, occasionally could carry 5 pounds of weight, could stand and/or walk for 2 hours in an 8-hour workday (no more than 30 minutes at a time), could sit an average of 3 hours in an 8-hour workday (no more than 30 minutes at a time), and could maintain no longer than 2-3 hours at a workstation in an 8-hour workday between frequent, unscheduled breaks. (Id.) Dr. Beneck further indicated that plaintiff's chronic musculoskeletal pain

14

would limit her ability to twist, stoop, crouch, reach, push, or pull to less than 5% of an 8-hour workday and it would limit her ability to climb stairs and engage in gross and fine manipulation to less than 33% of an 8-hour workday. (Id.) Finally, Dr. Beneck characterized plaintiff's pain as "severe" and wrote that he considered his clinical findings to be consistent with her past EMG, X-ray, CTSCAN, EKG, and EEG results, as well as her psychiatric records. (Id. at 434)

## C. Appeals Hearing and ALJ's Decision

Plaintiff, her husband, her attorney, and independent vocational expert Mindy Lubeck appeared at the appeals hearing on April 12, 2005, via video teleconference.[13] (Id. at 22) ALJ Showalter explained that she would take the next few weeks to make an independent assessment of plaintiff's record, specifically her file, her testimony at the hearing, and the opinions of the vocational expert. (Id. at 461)

Plaintiff testified that, on April 25, 2001, increasing pain and fatigue caused her to stop working as a waitress. (Id. at 465-66) According to plaintiff, she regularly experienced pain and aching in her muscles, especially in her arms and legs. (Id. at 469) While her depression medications "somewhat helped" with her symptoms, she still experienced daily crying spells, anger outbursts, sleep and appetite difficulty, hopelessness, and frequent panic attacks. (Id. at 473-75) She described her panic attacks as occurring six to seven times a week, from 20 minutes to an hour. (Id.) The panic attacks consist of hysterical crying and a racing heartbeat. (Id.) Plaintiff

---

[13]Plaintiff, her husband, her attorney, and the independent vocational expert appeared at the New Castle, Delaware hearing office, while ALJ Showalter conducted the hearing from a hearing office in Cambridge, Maryland. (D.I. 7 at 460)

15

additionally testified that she suffered migraine headaches about two to three times per month. (Id. at 476) Plaintiff indicated that she could only stand for 5 to 10 minutes, sit for 30 minutes, lift up to 5 pounds of weight, and walk distances of 600 feet or less. (Id. at 479-80) Plaintiff said she could only bend or stoop if she was holding onto something and that she could no longer perform yardwork or most household tasks. (Id. at 480-85) Plaintiff's husband testified that his wife spent the majority of the day in bed, with only short bursts of energy between extended rest periods. (Id. at 492)

Plaintiff described the severity of her pain throughout the hearing, at one point saying: "The pain is constant. It's all day and all night. It feels like I have the flu all the time, but I also get stabbing pain, burning pain. My muscles twitch. I sometimes get what feels like electric shocks in my muscles." (Id. at 468) When asked about her migraine headaches, plaintiff replied, "I can tell when one's coming on[,] my shoulders, my muscles in my shoulders get so tight that I can't move my head. When I get these headaches, I can't lay down. I have to sit like on the edge of a sofa, because I can't stand for anything to touch my shoulders or my head. I'm sensitive to light and noise, and they have lasted up to five days." (Id. at 476-77)

Ms. Lubeck, the independent vocational expert, indicated that very few skills from plaintiff's previous jobs were transferable to a new job. (Id. at 497) While she indicated that vehicle operating skills, skills in dealing with the public, and record keeping/money handling skills were transferable to jobs with lower exertional levels, ALJ Showalter summarized Ms. Lubeck's testimony as indicating "essentially no transferable skills." (Id.)

ALJ Showalter asked Ms. Lubeck to

16

[c]onsider a hypothetical person who is about the plaintiff's stated age at onset, 47 years, 12th grade education, the work history that you cited. This individual has certain underlying impairments that cause limitations. This person, although semiskilled work background, is limited to simple, unskilled work at a light level of exertion with all of the posturals occasional and avoiding concentrated exposure to extremes in cold and to hazards.

(Id. at 498) Ms. Lubeck felt that such an individual would be capable of jobs such as cashier, ticket seller, or hand packager. (Id.) Ms. Lubeck also indicated that such jobs existed in substantial numbers locally. (Id.)

Plaintiff's attorney asked Ms. Lubeck: "If that same individual also had medical problems which created fatigue to the point where it would interfere with her job at least one hour per day or more than one hour per day – and that is interfere with her ability to do any of these jobs, cashier, assembly, hand packager – would she be able to maintain those jobs?" (Id. at 499) Ms. Lubeck testified that such capacity would not be consistent with full-time work. (Id.) Plaintiff's attorney further asked Ms. Lubeck if such an individual would be able to maintain those jobs "[i]f the individual suffered from psychological problems and had panic attacks several times a month, which stopped work, and they became hysterical and lasted between 20 minutes and, I guess, 20 to 40 minutes at, at a time, several times a month." (Id. at 500) Ms. Lubeck replied that she doubted any employer would tolerate such behavior on a regular basis. (Id.) Finally, Ms. Lubeck opined that if such an individual also experienced severe pain, causing them to miss at least an hour of work a day, in addition to normal breaks, the individual would not be able to perform the job requirements of a cashier, ticket seller, or hand packager. (Id.)

On April 27, 2005, ALJ Showalter issued a "Notice of Decision – Unfavorable,"

17

confirming the SSA's denial of DIB to plaintiff. (Id. at 19-21) ALJ Showalter made the

following findings in her decision:

1. The plaintiff meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2002.

2. The plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.

3. The plaintiff's fibromyalgia, depression and cervical degenerative disc disease are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).

4. These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The plaintiff's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The plaintiff has the residual functional capacity to perform a significant range of light work. She is occasionally able to climb stairs, ramps, ladders, ropes or scaffolds and occasionally balance, stoop, kneel, crouch and crawl. She must avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.) and is limited to simple, unskilled work.

7. The plaintiff is unable to perform any of her past relevant work (20 C.F.R. § 404.1565).

8. The plaintiff is an "individual closely approaching advanced age" (20 C.F.R. § 404.1563).

9. The plaintiff has a "high school (or high school equivalent) education" (20 C.F.R § 404.1564).

10. The plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. § 404.1568).

11. The plaintiff has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 404.1567).

12. Although the plaintiff's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy

18

that she could perform. Examples of such jobs include work as a cashier/ticket seller, assembler or hand packager.

13. The plaintiff was not under a "disability," as defined in the Social Security Act, at any time prior to December 31, 2002, the date her insured status expired. (20 C.F.R. § 404.1520(g)).

(Id. at 449-50)

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R. Civ. P. 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a

19

trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion. See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. ALJ's Rationale for finding Plaintiff "Not Disabled"

An ALJ must perform a five-step sequential analysis to determine whether a

20

claimant is disabled. See 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently performing substantial gainful work. See id. Substantial gainful work is work that requires significant physical or mental activities. See id. If an ALJ finds that a claimant is currently performing substantial gainful work, the disability analysis ends and the claimant is found not disabled. See id. In the case at bar, the ALJ found that plaintiff had done no substantial gainful work since April 25, 2001 – the date when plaintiff allegedly became disabled. (D.I. 7 at 439)

When an ALJ finds that the claimant is not currently performing substantial gainful work, the ALJ must determine whether the claimant's impairment is severe according to the Social Security Rules and Regulations (the "SSRR"). See 20 C.F.R. § 404.1520. When an ALJ determines that a claimant's impairment is not severe, the disability analysis ends and the claimant is found not disabled. See id. A medically determinable impairment or combination of impairments is considered "severe" if it significantly limits a claimant's physical or mental ability to perform basic work activities. See id. In the case at bar, the ALJ found that the combined effect of plaintiff's fibromyalgia, depression, and cervical degenerative disc disease was severe. (D.I. 7 at 441)

When an ALJ finds that a claimant's impairment is severe, the ALJ has reached the third step of the disability analysis. This is a two-part step. First, a claimant's severe impairment must have lasted for over twelve months or be projected to last over twelve months. See 20 C.F.R. § 404.1520. Second, a claimant's impairment must "meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (the "listings")." (D.I. 7 at 441) If an ALJ

21

finds that a claimant's impairment has lasted, or will last, over twelve months, and that the impairment meets or medically equals any listing, the disability analysis ends and the claimant is found disabled. See 20 C.F.R. § 404.1520. In the case at bar, the ALJ found that, although plaintiff's impairments had lasted over twelve months, they failed to meet or medically equal any listing. (D.I. 7 at 441)

When an ALJ finds that a claimant's impairment fails to meet the criteria of a specific listing, step four of the disability analysis requires the ALJ to consider whether the impairment would prevent the claimant from resuming her previously held jobs. See 20 C.F.R. § 404.1520. In the case at bar, the ALJ found that plaintiff's impairments prevented her from resuming either of her previous jobs – bus driving and waitressing. (D.I. 7 at 447) In summary, the ALJ found that (a) plaintiff was not currently performing substantial gainful work, (b) plaintiff's impairments were severe, (c) plaintiff's impairments failed to meet or medically equal any listings, and (d) plaintiff was unable to resume her previous jobs. When an ALJ finds that a claimant suffers a serious impairment which prevents the claimant from doing her previous jobs but fails to meet any listings, the disability analysis proceeds to step five. See 20 C.F.R. § 404.1520.

Step five of the disability analysis is the final determination of whether a claimant is found disabled or not disabled. In step five, an ALJ considers whether a claimant is capable of performing any work that exists in sufficient numbers in the national economy. In the case at bar, plaintiff was found not disabled because the ALJ concluded that there was sufficient work in the national economy that plaintiff could perform. When determining if and where a claimant is able to work, an ALJ must assess all the relevant medical evidence as well as any other evidence within the case

record. In the case at bar, the ALJ determined that plaintiff "is capable of performing simple, unskilled work at a light level of exertion with all of the posturals occasional and avoiding concentrated exposure to extreme cold and other hazards." (D.I. 7 at 495) The vocational expert's opinion regarding which available jobs an individual such as plaintiff could perform was based on this determination.[14] (Id.)

Plaintiff disputes whether the ALJ adequately considered and weighed all appropriate evidence in her step five analysis. Specifically, plaintiff contends (1) the ALJ did not give sufficient weight to the medical opinions of plaintiff's treating physicians and (2) the ALJ improperly applied the SSRR when she determined that plaintiff was not entirely credible. (D.I. 12 at 2)

## B. ALJ's Weighing of Medical Evidence

The Court of Appeals for the Third Circuit has long adhered to the treating physician doctrine. See Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993); Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984). See also 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician is given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2000) (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)).

An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence, not due to his or her own credibility judgments,

---

[14]The vocational expert interpreted the ALJ's instructions as indicating that the individual in question could perform "almost a full range of light work." (D.I. 7 at 498)

speculation or lay opinion. See Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). If a treating physician's opinion is rejected, the ALJ must still determine the weight to award the physician's opinion considering the factors mentioned in 20 C.F.R. § 404.1527(d)(2)-(6).[15] The ALJ is required to give "specific reasons for the weight given to the treating source's opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight given to the treating source's medical opinion and the reasons for that weight." See SSR 96-2. Failure of an ALJ to give such an indication prevents a reviewing court from determining if "significant probative evidence was not credited or if it was simply ignored." See Fargnoli, 247 F.3d 34 at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). If a reviewing court is denied this opportunity, the claim must be remanded or reversed and all evidence must be addressed. See Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

Because non-examining state agency medical and psychological consultants are "highly qualified" physicians and psychologists and "experts in the evaluation of the medical issues in disability claims under the Social Security Act (the "Act")," their opinions on an claimant's residual functional capacity are entitled to weight. See Jones v. Sullivan, 954 F.2d 125, 138 (3d Cir. 1991). See also 20 C.F.R. § 404.1527(f). Therefore, when there is conflicting evidence, including medical opinions, an ALJ decides whether a claimant is disabled after carefully evaluating all available evidence.

---

[15]These factors include treatment relationship, length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(d)(2)-(6).

See 20 C.F.R. § 404.1527(c)(2).

In the case at bar, plaintiff contends that the ALJ failed to assign proper weight to two medical opinions – a "Mental Impairment Questionnaire" that Dr. Galvis, plaintiff's regular treating psychiatrist, filled out on March 17, 2005, and a "Residual Functional Capacity Evaluation" that Dr. Beneck, plaintiff's regular treating pain management physician, filled out on April 12, 2005. (D.I. 12 at 22) In response, defendant claims that plaintiff may not rely on evidence that post-dates the expiration of plaintiff's insurance to show disability under the Act. (D.I. 15 at 24) According to defendant, the ALJ properly evaluated all medical evidence from April 25, 2001, the date plaintiff allegedly became disabled, through the expiration of plaintiff's insurance on December 31, 2002 (the "relevant time period"). (Id.)

Defendant is correct that, if plaintiff fails to prove disability during the relevant time period, plaintiff is not disabled. See Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990) (stating that a claimant is required to establish that she became disabled prior to the expiration of her insured status). See also 20 C.F.R. §§ 404.101(a), 404.131(a). However, the court does not believe that it should separate out any medical evidence dated after the relevant time period and consider it virtually weightless.

Indeed, the ALJ thoroughly discussed all of plaintiff's medical evidence, including all medical evidence that post-dated the relevant time period. The ALJ devoted a substantial portion of her decision to explain why she gave more weight to the evaluations of the state consultants than to the 2005 evaluations given by Dr. Galvis

and Dr. Beneck (the "recent evaluations").[16] (D.I. 7 at 438-50) Therefore, the court will determine whether the Commissioner's decision is based on substantial evidence after considering the entire medical record and determining which evaluations describe plaintiff's condition in the relevant time period.

As tends to be the case with long medical histories, various doctors have offered different assessments of plaintiff's limitations.[17] The recent evaluations are two of the most severe accounts of plaintiff's condition and resulting capabilities. (D.I. 7 at 426-30, 432-34) The ALJ gave two reasons for her decision to "not afford any significant weight" to the recent evaluations. (Id. at 444) First, the ALJ noted that the recent evaluations appear on fill-in-the-blank forms, with only marginal notes attached to them. (Id.) The Third Circuit has indicated that such reports constitute weak evidence when unaccompanied by a thorough written report. See Mason v. Shalala, 994 F.2d at 1065. Second, the ALJ found that the recent evaluations "conflicted with substantial evidence of record, documenting less severe limitations." (D.I. 7 at 444)

The ALJ's decision to give no significant weight to the opinions of Dr. Galvis and Dr. Beneck because of the fill-in-the-blank nature of the forms they submitted is curious at best. The forms filled out by the state consultants can equally be described as fill-in-the-blank, without any thorough written reports. (Id. at 213-20, 229-46, 247-64, 265-72,

---

[16]Significantly, most of the medical examiners, including state consultants, evaluated plaintiff's current condition in light of the underlying diagnoses.

[17]For example, one state consultant opined that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds. (D.I. 7 at 355-62) Another state consultant opined that plaintiff could occasionally lift 10 pounds and frequently lift less than 10 pounds. (Id. at 265-72)

337-54, 355-62) Although the consultants, some more than others, included a few explanatory notes in their assessments, they offered nothing approaching a "thorough written report." (Id.) However, it was these non-examining consultants to whom the ALJ afforded "significant weight." (Id. at 445)

The court agrees with plaintiff that "a treating physician's report is not only based on actual examination, but it is also accompanied by the progress notes that were kept when the examinations were performed. These opinions are formed presumably based on a long-standing relationship, after which time the treating physician has adequately reviewed their own records, and formed an opinion not only based on the written documents they have available, but also on observations they were able to make through actual treatment." (D.I. 12 at 23) For example, on Dr. Beneck's "Mental Impairment Questionnaire," he refers to Dr. Galvis' collection of psychiatric records when asked to indicate whether objective tests supported his conclusion. (D.I. 7 at 434) The court finds it immaterial whether a doctor gives detailed written justification on the actual evaluation form or refers to a complete long term medical record containing pages of "thorough written reports."

The court is equally unpersuaded by the ALJ's conclusive statement that the evidence at issue "conflicts with the substantial evidence of record, documenting less severe limitations." (Id. at 444) Although the ALJ concluded that "[Dr. Galvis and Dr. Beneck] did not adequately consider the entire record, including the statements of collateral sources, including the objective findings of other treating physicians," (id. at 444), the opinions and findings of these two doctors comprise most of the record. Dr. Beneck and Dr. Galvis have regularly treated plaintiff for years and continue to treat

27

her. Furthermore, Dr. Galvis is the only treating psychiatrist who has ever examined plaintiff. There is no indication that either of these doctors considered the record to a lesser extent than the state consultants. In fact, if any expert opinions were based on an incomplete evaluation of the record, it was the state consultants. Every state consultant who filled out a PRFCA answered "no" on the part of the form that asks, "Is a treating or examining source statement(s) regarding the claimant's physical capacities in file?" (Id. at 219, 271, 279) In other words, the state consultants drew their conclusions based on specific medical results (such as x-rays) and various treatment records from examining sources. The consultants did not have any explanations or statements given by any physicians treating plaintiff regarding what they felt her limitations to be.

The court concludes, therefore, that the recent evaluations were not given their proper weight. The recent evaluations give the opinions of two examining physicians with whom plaintiff has had a long and frequent history. (Id. at 444) The ALJ instead selected various findings of plaintiff's other treating physicians, none of whom has established a long or frequent treating history comparable to that of Dr. Galvis and Dr. Beneck. The ALJ noted that Dr. Kim reported a normal range of motion in plaintiff's upper and lower extremities except for her shoulders, no joint swelling and no edema in her hands or feet. (Id. at 446) The ALJ also noted that Dr. Kim said plaintiff's muscle strength in her grip and upper and lower extremities as well as her gait were within normal limits. (Id.) However, the ALJ did not mention that Dr. Kim diagnosed plaintiff with fibromyalgia and depression, indicated that plaintiff's cervical range of motion was limited, and attributed muscle tenderness to plaintiff. (Id. at 206-12) Dr. Kim examined

28

plaintiff on only one occasion. (Id.) The ALJ referred to one of Dr. Beneck's observations from early in his treating relationship that plaintiff had normal and symmetric strength of her upper and lower extremities and deep tendon reflexes. (Id. at 446) However, Dr. Beneck's later evaluations should be given greater consideration because they were given after a much longer period of regular treatment. The ALJ also pointed to select findings from Dr. Rubin and Dr. Speller, each of whom examined plaintiff on only one occasion. (Id.) The ALJ mentioned in her decision that Dr. Speller reported that plaintiff's memory was excellent and that her judgment and insight were good and mentioned that Dr. Rudin reported good motor strength and reflexes. (Id.) However, the ALJ did not mention that Dr. Speller agreed with plaintiff's prior diagnoses of fibromyalgia and severe depression or that Dr. Rudin said plaintiff "suffered from multiple issues such as compression, fibromyalgia, and a large need for medication." (Id. at 223, 331)

The other factors in 20 C.F.R. § 404.1527(d)(2)-(6) are specialization, supportability, and consistency. All examining physicians whom the ALJ cites are qualified specialists in their respective fields. The issues of supportability and consistency are admittedly complex in plaintiff's case. Fibromyalgia is loosely defined by a constellation of symptoms. Depression is not easily quantifiable. While the scientific community seeks to further understand these impairments, no serious physician doubts their existence or that they can have devastating effects on a patient. By the very nature of these impairments, a high degree of supportability or consistency may not be realistic. The fact that physicians may not have completely consistent diagnoses of impairments should not be unexpected when it comes to such conditions

29

as fibromyalgia and depression. Many of plaintiff's physicians expressed difficulty discerning the etiology of plaintiff's symptoms. However, not a single examining physician even hinted at not "believing" plaintiff's account of her symptoms.

The court understands that, however genuine a claimant's complaints may appear to be, the regulations require objective clinical signs and laboratory findings which demonstrate the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. See 20 C.F.R. § 404.1529(b). With the exception of a few non-examining state consultants, no physician has questioned whether the necessary objective clinical signs or laboratory findings support plaintiff's alleged symptoms. The recent evaluations of Dr. Galvis and Dr. Beneck are the only assessments that plaintiff's long standing and frequently treating physicians have given of her residual functional capacity to engage in full time employment. By rejecting such significant medical evaluations, the court concludes that the ALJ's opinion in this regard is not based on substantial evidence.[18]

## C. ALJ's Assessment of Plaintiff's Credibility

According to Social Security regulations, when there is subjective testimony obtained that is corroborated by competent medical evidence, it should be given great weight. See Mason, 994 F.2d 1058 at 1067-68. If the objective medical evidence indicates that the condition exists, and it can reasonably produce the pain alleged, there is not a requirement that there be objective evidence of the pain itself. See Green v.

---

[18]Because the ALJ failed to give significant weight to the medical opinions of plaintiff's primary care physicians, the court notes that the hypothetical question asked of the vocational expert, regarding which jobs plaintiff could perform, could not have been fully accurate.

Schweiker, 749 F. 2d 1066 (3d Cir. 1984).

The ALJ gave multiple reasons for not considering plaintiff completely credible. For instance, the ALJ did not feel the level of symptoms plaintiff described were consistent with Dr. Labowitz's clinical findings, Dr. Kim's clinical findings, Dr. Beneck's reports during the relevant time period, Dr. Speller's clinical findings, and the opinions of the state consultants. (D.I. 7 at 445-47) The weight that should have been given to the various examining and non-examining physicians has already been analyzed. In sum, the recent evaluations of plaintiff's treating physicians deserve controlling weight if they are not inconsistent with the substantial evidence in the case record. See SSR 96-2p. While it may not be accurate to characterize the recent evaluations as consistent with other evidence, the recent evaluations are clearly not inconsistent with the other evidence. Importantly, there is no objective medical evidence that is directly inconsistent with plaintiff's description of her condition. Because of the ALJ's failure to extend proper weight to the recent evaluations, she also failed to include their findings in her decision regarding the plaintiff's credibility.

The ALJ did not consider plaintiff's testimony to be consistent with the long history of laboratory studies. (D.I. 7 at 445-47) Dr. Beneck, however, disagrees with the ALJ's medical determinations. Dr. Beneck indicated that plaintiff's symptoms were consistent with her medical history, including previous MRIs, EMGs, X-Rays, CT Scans, EKGs, EEGs, and psychiatric records. (Id. at 434) While the ALJ undoubtably has considerable experience with legal matters, the court puts more stake in Dr. Beneck's interpretation of plaintiff's medical history.

The ALJ noted that plaintiff's medical history had mostly been comprised of

31

conservative care and that plaintiff was never hospitalized because of her condition.
(Id. at 445-47) The court agrees with plaintiff that the reason for conservative treatment
and lack of hospitalization was not because her symptoms were not severe, but rather
because of the lack of suitable options. There is no serious surgical procedure or
program of hospitalization for those suffering from depression or fibromyalgia.
Unfortunately, until the medical community reaches new causal understandings of
these conditions and creates effective procedures for dealing with them, the best a
patient can do is take the medications and therapy currently available. Plaintiff's file
unmistakably demonstrates her attempts to do whatever was necessary to alleviate her
daily suffering. Furthermore, the Third Circuit has specifically indicated that it is
improper for an ALJ to discredit a claimant's subjective complaints on the basis of only
receiving "conservative care." See Sykes v. Apfel, 228 F.3d 259, 266 (3d Cir. 2000).

The ALJ also contends that her own observations of plaintiff's demeanor during
the hearing, as well as plaintiff's ability to complete her daily activities questionnaire in
detail, gave further support to the lack of credibility she extended plaintiff. (Id. at 445-
437) While there is some precedent for allowing an ALJ's personal observations at a
hearing to factor into a credibility assessment, see Torres v. Harris, 494 F. Supp 297,
300 (E.D.Pa. 1980), it is well settled that an ALJ cannot outrightly reject a treating
physician's assessment based on her own credibility judgments, speculation or lay
opinion. See Morales, 225 F.3d at 317 (quoting Plummer, 186 F.3d at 429).

The ALJ could not have properly assessed plaintiff's credibility if she gave no
weight to the treating physicians' evaluations. Furthermore, the ALJ's own impression
of plaintiff, acquired from miles away during a short video teleconference, should get

merely a scintilla of weight. The lack of hospitalization or extreme, risky treatment methods can hardly be held against plaintiff given the nature of the conditions from which she suffers. The court concludes, therefore, that the ALJ's decision in this regard is not supported by substantial evidence.

## D. Conclusion

Because the opinions of plaintiff's treating physicians were not given appropriate weight, the court finds that defendant's decision was not based on substantial evidence. The court remands the case to defendant for further proceedings, consistent with this memorandum opinion. An appropriate order shall issue.